IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

    and

ALLEGHENY COUNTY HEALTH
    DEPARTMENT,

               Plaintiffs,

     v.

                                    Civil No. 2:22-cv-00729-CB-CRE

UNITED STATES STEEL CORPORATION,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**CONSENT DECREE**

TABLE OF CONTENTS

I.      JURISDICTION AND VENUE ............................................................................................... 2

II.     APPLICABILITY ................................................................................................................. 2

III.    DEFINITIONS .................................................................................................................... 3

IV.     CIVIL PENALTY ............................................................................................................... 9

V.      COMPLIANCE REQUIREMENTS ......................................................................................... 11

        A. EMISSIONS CONTROLS ................................................................................................12

        B. MONITORING REQUIREMENTS ....................................................................................23

        C. MAINTENANCE PRACTICES .........................................................................................33

VI.     REPORTING REQUIREMENTS ............................................................................................ 39

VII.    STIPULATED PENALTIES .................................................................................................. 42

VIII.   FORCE MAJEURE ............................................................................................................ 48

IX.     DISPUTE RESOLUTION ..................................................................................................... 50

X.      INFORMATION COLLECTION AND RETENTION ................................................................. 52

XI.     EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ...................................................... 54

XII.    COSTS ............................................................................................................................ 56

XIII.   NOTICES ......................................................................................................................... 56

XIV.    EFFECTIVE DATE ........................................................................................................... 57

XV.     RETENTION OF JURISDICTION ......................................................................................... 58

XVI.    MODIFICATION ............................................................................................................... 58

XVII.   TERMINATION ................................................................................................................ 58

XVIII. PUBLIC PARTICIPATION .................................................................................................. 59

XIX.    SIGNATORIES/SERVICE ................................................................................................... 59

XX.     INTEGRATION ................................................................................................................. 60

XXI.    FINAL JUDGMENT ........................................................................................................... 60

XXII.   26 U.S.C. SECTION 162(F)(2)(A)(II) IDENTIFICATION.......................................................... 60

        APPENDICES ................................................................................................................... 61

A.      Plaintiff United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), has filed a Complaint in this action pursuant to Section 113(b) of the Clean Air Act ("CAA" or "Act"), 42 U.S.C. § 7413(b), concurrently with this Consent Decree. The Complaint alleges that Defendant United States Steel Corporation ("U. S. Steel") violated the Allegheny County portion of Pennsylvania's CAA State Implementation Plan ("SIP"), the National Emission Standards for Hazardous Air Pollutants for Integrated Iron and Steel Manufacturing Facilities, and the CAA Title V Permit for U. S. Steel's Edgar Thomson Steel Plant facility ("Facility") located in Braddock, Pennsylvania.

B.      On November 9, 2017, EPA, in consultation with the Allegheny County Health Department ("ACHD"), issued CAA Notice of Violation ("NOV") No. CAA-III-18-0002 to U. S. Steel, and provided a copy of the NOV to the Commonwealth of Pennsylvania and ACHD as required by Section 113(a)(1) of the CAA, 42 U.S.C. § 7413(a)(1). The United States is providing notice of the commencement of this action to the Commonwealth of Pennsylvania as required by Section 113(b) of the CAA, 42 U.S.C. § 7413(b).

C.      Plaintiff ACHD has joined this action.

D.      U. S. Steel does not admit any liability to the United States or ACHD arising out of the transactions or occurrences alleged in the Complaint.

E.      The Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation among the Parties and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I (Jurisdiction and Venue),

1

and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I.      JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1345, 1355, and Sections 113(b) and 304 of the CAA, 42 U.S.C. §§ 7413(b) and 7604, and over the Parties. This Court has supplemental jurisdiction over the State law claims asserted by ACHD pursuant to 28 U.S.C. § 1367. Venue lies in this District pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b)-(c) and 1395(a), because the violations alleged in the Complaint are alleged to have occurred in, and U. S. Steel conducts business in, this judicial district. For purposes of this Decree, or any action to enforce this Decree, U. S. Steel consents to the Court's jurisdiction over this Decree and any such action and over U. S. Steel and consents to venue in this judicial district.

2.      For purposes of this Consent Decree, U. S. Steel agrees that the Complaint states claims upon which relief may be granted pursuant to Sections 113(b) and 304 of the CAA, 42 U.S.C. §§ 7413(b) and 7604.

## II.      APPLICABILITY

3.      The obligations of this Consent Decree apply to and are binding upon the United States and ACHD, and upon U. S. Steel and any successors, assigns, or other entities or persons otherwise bound by law.

4.      No transfer of ownership or operation of the Facility, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve U. S. Steel of its obligation to ensure that the terms of the Decree are implemented. At least 30 Days prior to such transfer, U. S. Steel shall provide a copy of this Consent Decree to the proposed transferee and shall simultaneously

provide written notice of the prospective transfer, together with a copy of the proposed written agreement, to EPA Region III, DOJ, and ACHD, in accordance with Section XIII (Notices). Any attempt to transfer ownership or operation of the Facility without complying with this Paragraph constitutes a violation of this Decree.

5.      U. S. Steel shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include compliance with any provision of this Decree, as well as to any contractor retained to perform work required under this Consent Decree. U. S. Steel shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree.

6.      In any action to enforce this Consent Decree, U. S. Steel shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

### III.      DEFINITIONS

7.      Terms used in this Consent Decree that are defined in the Act or in regulations promulgated pursuant to the Act have the meanings assigned to them in the Act or such regulations, unless otherwise provided in this Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions apply:

"ACHD" means the Allegheny County Health Department and any of its successor departments or agencies;

"Basic Oxygen Process Furnace" or "BOPF" means a refractory-lined vessel in which high-purity oxygen is blown under pressure through a bath of molten iron, scrap metal, and fluxes to produce steel. This definition includes both top and/or bottom blown furnaces but does not include argon oxygen decarburization furnaces. There are two BOPF vessels at the Facility,

designated Vessel F and Vessel R, where molten iron and scrap steel are converted into molten steel through the use of high purity oxygen blowing;

"Blast Furnace" means a furnace used for the production of molten iron from materials including iron pellets, iron bearing materials, coke, and fluxes. There are two blast furnaces at the Facility, designated Blast Furnace No. 1 and Blast Furnace No. 3;

"Blast Furnace Stove Stack" means the emission point that discharges emissions from the combustion of Blast Furnace gas, coke oven gas, and natural gas, or other enriching gas, which is used to heat the combustion air for the Blast Furnace;

"BOP Shop" means the place where steelmaking operations occur, beginning with the transfer of molten iron (hot metal) from the torpedo car and ending prior to casting the molten steel, including hot metal transfer, desulfurization, slag skimming, refining in a basic oxygen process furnace, and ladle metallurgy;

"BOP Shop Access Door" means the door at the 6th and ½ floor level of the BOP Shop which opens to the F-2 Belt used by maintenance staff as a means of egress to complete various tasks;

"BOP Shop Fugitive Baghouse" means the ten-compartment fabric filter baghouse used for the capture and collection of secondary emissions (particulate matter emissions that are not controlled by the primary emission control system, including emissions that escape from open and closed hoods, lance hole openings, and gaps or tears to the primary emission control system);

"BOP Shop Ladle Metallurgy Furnace (LMF) Baghouse" means the six-compartment fabric filter for the control of particulate matter emissions generated by the ladle metallurgy furnace;

"BOP Shop Mixer Baghouse" means the 12-compartment fabric filter for the control of particulate matter emissions generated by the molten iron mixing and desulfurization operation in the BOP Shop;

"BOP Shop Primary Emissions System" means the BOP Shop Scrubber System used for the capture and collection of primary emissions and all associated hoods and ductwork used to route waste gas to the BOP Shop Scrubber System;

"BOP Shop Roof Monitor" means the openings along the length of the BOP Shop roof at the Facility;

"BOP Shop Scrubber Stack" means the emission point that discharges emissions from the BOP Shop Scrubber System. There are two BOP Shop Scrubber Stacks at the Facility, designated as Stack A and Stack B;

"BOP Shop Scrubber System" means the wet scrubber used to control primary emissions from the BOPF operation by removing particulate matter from the waste gas stream of the BOPF;

"Casthouse" means the building or structure that includes the bottom portion of a Blast Furnace where the hot metal and slag are tapped from the furnace. Both Blast Furnaces at the Facility have their own dedicated Casthouse;

"Casthouse Baghouse" means the four-compartment fabric filter for the control of particulate matter emissions from both of the Blast Furnace Casthouses at the Facility;

"Casthouse Baghouse System" means the Casthouse Baghouse as well as the collection of hoods and ductwork used to route emissions to the Casthouse Baghouse;

"Casthouse Roof Monitor" means the openings along the roof of each Blast Furnace Casthouse, including the annular gap where the furnace protrudes through the Casthouse roof structure;

"Complaint" means the complaint filed by the United States and ACHD in this action;

"Consent Decree" or "Decree" means this Decree and all appendices attached hereto;

"Day" means a calendar day unless expressly stated to be a business day. In computing any period of time for a deadline under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period runs until the close of business of the next business day;

"Defendant" means the United States Steel Corporation ("U. S. Steel");

"DOJ" means the United States Department of Justice and any of its successor departments or agencies;

"EPA" means the United States Environmental Protection Agency and any of its successor departments or agencies;

"Effective Date" means the definition provided in Section XIV;

"Facility" means U. S. Steel's Edgar Thomson Steel Plant located in Braddock, Pennsylvania;

"Facility-Wide Asset Tree" means a system by which U. S. Steel catalogues and tracks the quantity, availability, and location of individual parts and components required by the various processes at the Facility;

"$H_2S$" means hydrogen sulfide;

"Malfunction" means any sudden, infrequent, and not reasonably preventable failure of air pollution control and/or monitoring equipment, process equipment, or a process to operate in

6

a normal or usual manner which causes, or has the potential to cause, an emission limitation in this Consent Decree to be exceeded. Failures that are caused in part or in whole by poor maintenance or by careless operation are not malfunctions;

"Maintenance Practices Audit" means the audit conducted by the Maintenances Practices Auditor pursuant to Paragraph 48 of this Consent Decree;

"Maintenance Practices Auditor" means an independent third party meeting the requirements of Paragraph 49 who is approved by EPA, in consultation with ACHD, and contracted by U. S. Steel to perform the duties set forth in Paragraphs 50 and 51;

"Operation and Maintenance Plan" or "O&M Plan" means the written plan required by 40 C.F.R. § 63.7800(b) for each capture system or control device subject to an operating limit in 40 C.F.R. § 63.7790(b);

"Paragraph" means a portion of this Decree identified by an Arabic numeral;

"Parties" means the United States, ACHD, and U. S. Steel;

"Plaintiffs" means the United States and ACHD;

"PM" means particulate matter;

"Post-Study VEOs" means Visible Emissions observations using EPA Method 9, 40 C.F.R. Part 60, Appendix A-4, that are conducted after the submittal of notices of completion for the Blast Furnace Casthouse, BOP Shop Roof Monitor, and BOP Shop Scrubber Stack pursuant to Paragraphs 21, 28, and 35, respectively.

"Pre-Study VEOs" means Visible Emissions observations using EPA Method 9, 40 C.F.R. Part 60, Appendix A-4, that are conducted prior to the submittal of notices of completion for the Blast Furnace Casthouse, BOP Shop Roof Monitor, and BOP Shop Scrubber Stack pursuant to Paragraphs 21, 28, and 35, respectively.

"Riley Boilers" means the three multi-fuel firing, water-tube boilers at the Facility designated as Boilers 1, 2, and 3;

"Section" means a portion of this Decree identified by a Roman numeral;

"Slag Pit" means the water- and air-cooled pit system utilizing direct pour of slag from Blast Furnaces Nos. 1 and 3 into troughs located in the Blast Furnace Casthouse floors and transferred to pits adjacent to the blast furnaces;

"$SO_2$" means sulfur dioxide;

"$SO_2$ CEMS" means a Continuous Emissions Monitoring System for $SO_2$ that meets the requirement of 40 C.F.R. Part 75; 25 Pa. Code Chapter 139.102(3); and ACHD Rules and Regulations, Article XXI, § 2108.03;

"Steel Production Cycle" means the operations conducted within the basic oxygen process furnace shop that are required to produce each batch of steel, including scrap charging, preheating, hot metal charging, primary oxygen blowing, sampling (vessel turndown and turnup), additional oxygen blowing, tapping, and deslagging. The steel production cycle begins when the scrap is charged to the furnace and ends three minutes after the slag is emptied from the vessel into the slag pot;

"Torpedo Car" means a refractory lined rail car designed specifically to transport molten iron at the Facility from the Blast Furnace Casthouse to the BOP Shop;

"United States" means the United States of America, acting on behalf of EPA;

"Visible Emissions" means emissions of air contaminants which can be seen with the naked eye in contrast with any background.

"Week" means the period of time from Monday through Sunday.

IV.   CIVIL PENALTY

8.      U. S. Steel has agreed to pay a civil penalty of $1,500,000 to the United States and ACHD collectively, as provided below.

9.      Within 30 Days after the Effective Date, U. S. Steel shall pay to the United States the sum of $750,000, together with interest accruing from the date on which the Consent Decree is lodged with the Court, at the rate specified in 28 U.S.C. § 1961 as of the date of lodging.

10.     U. S. Steel shall pay the civil penalty due to the United States by FedWire Electronic Funds Transfer ("EFT") to the DOJ account, in accordance with instructions provided to U. S. Steel by the Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Western District of Pennsylvania after the Effective Date. The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which U. S. Steel shall use to identify all payments required to be made in accordance with this Consent Decree. The FLU will provide the payment instructions by e-mail to: David W. Hacker, dwhacker@uss.com, (412) 433-2919, United States Steel Corporation, 600 Grant Street, Suite 1844, Pittsburgh, PA 15219, on behalf of U. S. Steel. U. S. Steel may change the individual to receive payment instructions on its behalf by providing written notice of such change to DOJ and EPA in accordance with Section XIII (Notices).

11.     At the time of payment to the United States, U. S. Steel shall send notice that payment has been made: (i) to EPA via email at CINWD_AcctsReceivable@epa.gov or via regular mail at EPA Cincinnati Finance Office, 26 W. Martin Luther King Drive, Cincinnati, Ohio 45268; (ii) to DOJ via email or regular mail in accordance with Section XIII (Notices); and (iii) to the EPA Region III Regional Hearing Clerk at R3_Hearing_Clerk@epa.gov. Such notice shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in

*United States et al. v. U. S. Steel Corporation* (W.D. Pa.) and shall reference the civil action

number, CDCS Number, and DOJ case number 90-5-2-1-12083.

12.     U. S. Steel shall pay a civil penalty of $750,000 to ACHD. In lieu of receiving

payment, ACHD agrees that U. S. Steel shall satisfy the ACHD civil penalty by providing

funding in the amount of $750,000 to the Allegheny County Department of Economic

Development, which ACHD has approved as a Supplemental Environmental Project

("ACHD-Only SEP"). The ACHD-Only SEP is described in Appendix A.

   a.     Certification:  For the ACHD-Only SEP, U. S. Steel certifies as follows:

      (1)     That, as of the date of executing this Consent Decree, U. S. Steel is

         not required to perform or develop the ACHD-Only SEP by any

         federal, state, or local low or regulation and is not required to

         perform or develop the ACHD-Only SEP by agreement, grant, or

         as injunctive relief awarded in any other action in any forum.

      (2)     That the ACHD-Only SEP is not a project that U. S. Steel was

         planning or intended to construct, perform, or implement other

         than in settlement of the claims resolved in this Consent Decree.

      (3)     U. S. Steel has not received and will not receive credit for the

         ACHD-Only SEP in any other enforcement action.

      (4)     U. S. Steel will not receive reimbursement for any portion of the

         ACHD-Only SEP from another person or entity.

      (5)     Any public statement, oral or written in print, film, or other media,

         made by U. S. Steel making reference to the ACHD-Only SEP

         under this Consent Decree from the date of its execution shall

include the following language: "This project was undertaken in connection with the settlement of an enforcement action, *United States et al. v. U. S. Steel Corporation* (W.D. Pa.), taken on behalf of ACHD to enforce federal and state laws.

13.     U. S. Steel shall not deduct any penalties paid under this Decree pursuant to this Section or Section VII (Stipulated Penalties) in calculating its federal or State or local income tax.

## V.     COMPLIANCE REQUIREMENTS

14.     <u>Pre-Settlement Remedial Measures Completed Since EPA Issued the NOV</u>:  As of the date of lodging of this Consent Decree, U. S. Steel has performed certain actions to address the violations alleged in the Complaint, including, but not limited to:

a.     Blast Furnace Casthouse Baghouse upgrades included replacement of the cleaning air system, baghouse filter bags with new membrane-style bags, cages, access doors, rotary valves, motors and fan sheaves;

b.     BOP Shop Fugitive Baghouse upgrades included replacement of the cleaning air system, baghouse filter bags with new membrane-style bags, cages, access doors, and rotary valves;

c.     BOP Shop Mixer Baghouse upgrades included replacement/repair of the cleaning air system, baghouse filter bags, and access doors;

d.     BOP Shop Ladle Metallurgy Furnace Baghouse upgrades included replacement of the cleaning air system and baghouse filter bags;

e.     Research and development to refine tap hole clay chemistry at Blast Furnace No. 1;

f.     Re-training of third-party contractors responsible for roadway monitoring;

g.     Re-training of BOP Shop employees responsible for keeping the BOP Shop doors closed;

h.     Installing an alarm that provides a notification in the BOP Shop pulpit if the BOP Shop Access Door is open for longer than one minute, so that corrective action can be taken as quickly as possible;

i.     Implementing a revised BOP Shop Primary Emissions System fan switching procedure;

j.     Reconfiguring the gas lance system to better reduce emissions generated when molten iron enters the sub ladles at the Blast Furnace Casthouses; and

k.     Adopting and implementing, in addition to the Facility's Operation and Maintenance Plan, an ACHD-approved standard operating procedure for Torpedo Cars producing Visible Emissions that requires (1) the use of temporary covers on empty Torpedo Cars wherever practicable and except for periods of high winds and crane Malfunctions, and (2) moving cars to appropriate process areas as soon as possible.

A. EMISSIONS CONTROLS

15.    <u>Casthouse Baghouse</u>:  U. S. Steel has retained and EPA, after consultation with ACHD, has approved, an independent third-party contractor to conduct a study of the Casthouse Baghouse System, to ensure that U. S. Steel can maintain compliance with ACHD Rules and Regulations Article XXI, § 2104.01, as more fully described in Paragraph 17.

16.     <u>Selection of Replacement Contractor for Casthouse Baghouse System Study</u>:  If at any time U. S. Steel seeks to replace the independent third-party contractor, U. S. Steel shall submit to EPA and ACHD a list of two or more proposed contractors with experience in evaluating air pollution control compliance at blast furnace casthouses. The proposed contractors must have no direct financial stake in the outcome of the study. U. S. Steel shall disclose to EPA and ACHD any past or existing contractual or financial relationship with the proposed contractor when the proposed contractor is identified.

a.      EPA, in consultation with ACHD, shall notify U. S. Steel of whether it approves any contractors on the list submitted by U. S. Steel. If EPA, after consultation with ACHD, does not approve any of the proposed contractors, then U. S. Steel shall submit another list of proposed contractors to EPA and ACHD within 30 Days of receipt of EPA's written notice. If after U. S. Steel has submitted a third list of proposed contractors, which must be submitted within 30 Days of receipt of written notice that EPA has not approved any of the contractors on U. S. Steel's second list, the Parties are unable to agree on a contractor, the Parties agree to resolve the selection of the contractor through the procedures in Section IX (Dispute Resolution).

b.      Within 30 Days after U. S. Steel receives notice of EPA's approval, U. S. Steel shall retain one contractor from those approved by EPA, to perform the duties described in Paragraph 17.

17.     Within 30 Days of the Effective Date, U. S. Steel shall submit to EPA and ACHD for approval pursuant to Paragraph 57 (Approval of Deliverables), a plan, prepared with consultation of the independent contractor, to conduct the Casthouse Baghouse System Study.

      a.     The study shall evaluate the capacity of the Casthouse Baghouse System to capture and control air emissions from the Blast Furnace Casthouses. The Parties recognize that U. S. Steel may at times be forced to operate with two compartments of the Casthouse Baghouse offline with one Blast Furnace casting while the other Blast Furnace is opening or closing the taphole, and that a goal of the study should be to ensure that the Casthouse Baghouse System has sufficient capacity to maintain compliance with all applicable regulations, including ACHD Rules and Regulations Article XXI, § 2104.01, during such periods.

      b.     The study shall consider air pollution controls for each Blast Furnace during temporary stops in production and resumption in production, and shall be performed using U. S. Steel's operational personnel and under normal and anticipated operating conditions. The study period shall be conducted during a minimum of five consecutive Days, for which such operating conditions shall include a combined minimum production rate of 7,400 net tons of hot metal ("nthm") per 24 hours at Blast Furnace No. 1 and Blast Furnace No. 3 for at least four of those five Days.  If the production rate of 7,400 nthm per 24 hours is not achieved on at least four of the five Days as required above, U.S. Steel shall extend the study period to include two additional consecutive Days at a production rate of at least

7,400 nthm per 24 hours to satisfy the production rate criteria of the study. The study shall also include at least the following additional elements: development of a field-testing plan including any relevant past reports of the Casthouse Baghouse System; inspection and evaluation of the Casthouse Baghouse and emissions capture effectiveness between the furnace shells and Casthouse structures (including sheeting) at the hoods on the Number 1 and 3 Casthouses; evaluation of the overall capture for both furnaces, together and individually, including field measurements of system flows, pressures, and temperatures; Visible Emissions observations using EPA Method 9, 40 C.F.R. Part 60, Appendix A-4 ("Method 9") during such field measurements; evaluation of Visible Emissions from the Blast Furnace Casthouse Roof Monitor or Casthouse Baghouse, including the root cause of any Visible Emissions in excess of applicable opacity requirements; evaluation of the manner in which the Casthouse Baghouse is operated including blast furnace operating data relevant to damper positioning, fan motor ramp ups and downs, and cleaning cycle sequencing; evaluation of the particulate matter control and efficiency of the Casthouse Baghouse System; and opportunities for improvement, including the potential installation of additional baghouse capacity or compartments, in these areas. The study shall also include a report describing the methodology, observations, data, and other information reviewed, and the study's findings, along with a certification by

15

U. S. Steel and the third-party contractor that the study was performed in accordance with the provisions of this Consent Decree.

18.     The Casthouse Baghouse System Study shall be completed by no later than 120 Days after approval of the plan submitted in accordance with Paragraph 17.

19.     By no later than 90 Days after completion of the Casthouse Baghouse System Study, U. S. Steel shall submit to EPA and ACHD a copy of the completed third-party study along with a report for approval pursuant to Paragraph 57 (Approval of Deliverables) which includes:

      a.     Proposed improvements to the capture and control systems and Blast Furnace operating procedures to ensure compliance with applicable opacity requirements for the Blast Furnace Casthouses, including an evaluation of the potential improvements identified by the third-party study and justifications for including or excluding them from the proposed action(s);

      b.     Estimated costs of the proposed action(s); and

      c.     A schedule for completing the proposed action(s).

20.     EPA shall review the report required by Paragraph 19, in consultation with ACHD in accordance with Paragraph 57 (Approval of Deliverables), and U. S. Steel shall thereafter implement the proposed action(s) in accordance with the schedule in the approved report.

21.     Within 30 Days after completion of the approved action(s), U. S. Steel shall submit a notice of completion to EPA and ACHD that certifies that the actions were implemented in accordance with the approved report.

22. <u>BOP Shop Roof Ventilation</u>. U. S. Steel has retained and EPA, after consultation with ACHD, has approved, an independent third-party contractor to conduct a ventilation study to evaluate the capture and control of secondary emissions from the BOP Shop and identify the root cause of Visible Emissions from the BOP Shop Roof, as more fully described in Paragraph 24.

23. <u>Selection of Replacement Contractor for BOP Shop Roof Ventilation Study</u>: If at any time U. S. Steel seeks to replace the independent third-party contractor, U. S. Steel shall submit to EPA and ACHD a list of two or more proposed contractors with experience in evaluating air pollution control compliance at BOP Shops. The proposed contractors must have no direct financial stake in the outcome of the study. U. S. Steel shall disclose to EPA and ACHD any past or existing contractual or financial relationship with the proposed contractor when the proposed contractor is identified.

a. EPA, in consultation with ACHD, shall notify U. S. Steel of whether it approves any contractors on the list submitted by U. S. Steel. If EPA, after consultation with ACHD, does not approve any of the proposed contractors, then U. S. Steel shall submit another list of proposed contractors to EPA and ACHD within 30 Days of receipt of EPA's written notice. If after U. S. Steel has submitted a third list of proposed contractors, which must be submitted within 30 Days of receipt of written notice that EPA has not approved any of the contractors on U. S. Steel's second list, the Parties are unable to agree on a contractor, the Parties agree to resolve the selection of the contractor through the procedures in Section IX (Dispute Resolution).

17

  b. Within 30 Days after U. S. Steel receives notice of EPA's approval,

    U. S. Steel shall retain one contractor from those approved by EPA, to

    perform the duties described in Paragraph 24.

24. Within 60 Days of the Effective Date, U. S. Steel shall submit to EPA and ACHD for approval pursuant to Paragraph 57 (Approval of Deliverables), a plan, prepared with consultation of the independent contractor, to conduct the BOP Shop Roof Ventilation Study.

  a. The study shall consider air pollution control for the start-up and

    shut-down for each BOPF vessel, and shall be performed using

    U. S. Steel's operational personnel and under operating conditions that

    reflect normal and anticipated operating conditions, including those with

    minimal to no delays in process operations. The study shall also include at

    least the following additional elements: development of a field-testing

    plan including any relevant past reports of the BOP Shop Fugitive

    Baghouse system (including all associated hoods and ductwork);

    inspection and evaluation of the BOP Shop Fugitive Baghouse and

    emissions capture effectiveness within the BOP Shop; evaluation of the

    overall capture during oxygen blowing, including field measurements of

    system flows, pressures, and temperatures; Method 9 Visible Emissions

    observations during such field measurements; evaluation of Visible

    Emissions from the BOP Shop Roof Monitor or BOP Shop Fugitive

    Baghouse, including the root cause of any Visible Emissions in excess of

    applicable opacity requirements; evaluation of the manner in which the

    BOP Shop Fugitive Baghouse is operated including BOPF operating data

relevant to damper positioning fan motor ramp ups and downs, and cleaning cycle sequencing; evaluation of the particulate matter control and efficiency of the BOP Shop Fugitive Baghouse system (including all associated hoods and ductwork); and opportunities for improvement in these areas. The ventilation study shall also contain a description of the methodology, observations, data, and other information reviewed, and the study's findings, along with a certification by U. S. Steel and the third-party contractor that the study was performed in accordance with the provisions of this Consent Decree.

25. The BOP Shop Roof Ventilation Study shall be completed by no later than 120 Days after approval of the plan submitted in accordance with Paragraph 24.

26. By no later than 90 Days after completion of the BOP Shop Roof Ventilation Study, U. S. Steel shall submit to EPA and ACHD a copy of the completed third-party study along with a report for approval pursuant to Paragraph 57 (Approval of Deliverables) which includes:

   a. Proposed improvements to the capture and control systems and BOP Shop operating procedures to minimize emissions from the BOP Shop Roof Monitor and ensure compliance with applicable opacity requirements for the BOP Shop, including an evaluation of the potential improvements identified by the third-party study and justifications for including or excluding them from the proposed action(s).

   b. Estimated costs of the proposed action(s); and

   c. A schedule for completing the proposed action(s).

19

27.     EPA shall review the report required by Paragraph 26, in consultation with ACHD in accordance Paragraph 57 (Approval of Deliverables), and U. S. Steel shall thereafter implement the proposed action(s) in accordance with the schedule in the approved report.

28.     Within 30 Days after completion of the approved action(s), U. S. Steel shall submit a notice of completion to EPA and ACHD that certifies that the actions were implemented in accordance with the approved report.

29.     BOP Shop Scrubber System: U. S. Steel has retained and EPA, after consultation with ACHD has approved, an independent third-party contractor to conduct a study to evaluate the BOP Shop Scrubber System and identify the root cause of Visible Emissions at the BOP Shop Scrubber System from either Stack A or Stack B, as more fully described in Paragraph 31.

30.     Selection of Replacement Contractor for BOP Shop Scrubber System Study: If at any time U. S. Steel seeks to replace the independent third-party contractor, U. S. Steel shall submit to EPA and ACHD a list of two or more proposed contractors with experience in evaluating air pollution control compliance at BOP Shops. The proposed contractors must have no direct financial stake in the outcome of the study. U. S. Steel shall disclose to EPA and ACHD any past or existing contractual or financial relationship with the proposed contractor when the proposed contractor is identified.

　　　　　a.     EPA, in consultation with ACHD, shall notify U. S. Steel of whether it approves any contractors on the list submitted by U. S. Steel. If EPA, after consultation with ACHD, does not approve any of the proposed contractors, then U. S. Steel shall submit another list of proposed contractors to EPA and ACHD within 30 Days of receipt of EPA's written notice. If after U. S. Steel has submitted a third list of proposed

contractors, which must be submitted within 30 Days of receipt of written notice that EPA has not approved any of the contractors on U. S. Steel's second list, the Parties are unable to agree on a contractor, the Parties agree to resolve the selection of the contractor through the procedures in Section IX (Dispute Resolution).

b.   Within 30 Days after U. S. Steel receives notice of EPA's approval, U. S. Steel shall retain one contractor from those approved by EPA, to perform the duties described in Paragraph 31.

31.   Within 60 Days of the Effective Date, U. S. Steel shall submit to EPA and ACHD for approval pursuant to Paragraph 57 (Approval of Deliverables), a plan, prepared with consultation of the independent contractor, to conduct the BOP Shop Scrubber System Study.

a.   The study shall include at least the following elements: development of a field-testing plan including any relevant past reports of the BOP Shop Scrubber System; inspection and evaluation of the BOP Shop Scrubber System; evaluation of the overall capture of particulate matter, including field measurements of system flows, pressures, and temperatures; Method 9 Visible Emissions observations during such field measurements; evaluation of Visible Emissions from the two BOP Shop Scrubber Stacks, including the root cause of any Visible Emissions in excess of applicable opacity requirements; evaluation of the manner in which the scrubber is operated including BOP operating data relevant to damper positioning, fan and pump motor ramp ups and downs, emission minimization during fan switching procedures, and cleaning cycle sequencing of both the gas

21

stream and the scrubbing fluid; and opportunities for improvement, as applicable, in these areas. The study shall also contain a description of the methodology, observations, data, and other information reviewed, and the study's findings, along with a certification by U. S. Steel and the third-party contractor that the study was performed in accordance with the provisions of this Consent Decree.

32.     The BOP Shop Scrubber System Study shall be completed by no later than 120 Days after approval of the plan submitted in accordance with Paragraph 31.

33.     By no later than 90 Days after completion of the BOP Shop Scrubber System Study, U. S. Steel shall submit to EPA and ACHD a copy of the completed third-party study along with a report for approval pursuant to Paragraph 57 (Approval of Deliverables) which includes:

      a.     Proposed improvements to the BOP Shop Scrubber System and BOP Shop operating procedures to ensure compliance with applicable opacity requirements for the BOP Shop Scrubber Stacks, including an evaluation of the potential improvements identified by the third-party study and justifications for including or excluding them from the proposed action(s);

      b.     Estimated costs of the proposed action(s); and

      c.     A schedule for completing the proposed action(s).

34.     EPA shall review the report required by Paragraph 33, in consultation with ACHD in accordance Paragraph 57 (Approval of Deliverables), and U. S. Steel shall thereafter implement the proposed action(s) in accordance with the schedule in the approved report.

35.     Within 30 Days after completion of the approved action(s), U. S. Steel shall submit a notice of completion to EPA and ACHD that certifies that the actions were implemented in accordance with the approved report.

36.     Environmental Awareness Training. U. S. Steel shall conduct annual environmental awareness training for blast furnace operators, BOP Shop operators, transportation personnel responsible for Torpedo Cars, and other employees and contractors with responsibilities under this Consent Decree, to enable them to identify, control, and minimize the environmental impacts of their work and where possible identify environmental improvement opportunities.

### B. MONITORING REQUIREMENTS

37.     Emissions Surveillance and Process Optimization Cameras for Blast Furnace Area and BOP Shop. Within 180 Days after the Effective Date, U. S. Steel shall install and maintain a video camera system that includes multiple video cameras that are aimed at the Blast Furnace Stove Stacks, Casthouse Roof Monitors, Casthouse Baghouse, BOP Shop Roof Monitor, BOP Shop Scrubber Stacks, and the two Torpedo Car staging areas near the location of the Riley Boilers. The video camera system shall record and send live video feeds to appropriate personnel, including personnel in the control rooms for the Casthouses and BOP Shop. The video camera system shall:

        a.     consist of no fewer than seven permanently installed video cameras strategically placed at the Facility that record, during daylight hours, the areas identified in this Paragraph;

b.      record in digital format at a rate of no less than 1 frame per second, having
a resolution of no fewer than 20 pixels per foot;

c.      date and time stamp the recordings, and

d.      be maintained in a manner consistent with manufacturer
recommendations.

38.     U. S. Steel shall maintain recordings from the video camera system in MP4,
MKV, or other format supported by the camera system. U. S. Steel shall maintain the video
camera recordings in a labeled and chronologically-ordered system for at least 30 rolling Days,
and shall make such recordings available for viewing by ACHD while at the Facility on
monitor(s) provided by U. S. Steel.  After ACHD's viewing of video recordings, ACHD shall
identify portions of the video recordings for downloading or transfer by U. S. Steel to ACHD.  In
addition, while at the Facility, ACHD may also take still shots of the video recordings as long as
the shots do not include U. S. Steel or contractor personnel and copies of such still shots are
shared with U. S. Steel before ACHD leaves the Facility.  ACHD cannot share the shots with any
third party until either U. S. Steel provides written or electronic confirmation of receipt of the
still shots or two business days from when the shots were successfully electronically shared with
U. S. Steel via an email sent to cdavis@uss.com, cwhardin@uss.com, dwhacker@uss.com, and
ETphotos@uss.com, whichever is earlier.  U. S. Steel shall make all video recordings
downloadable or transferrable to ACHD within five business days of the ACHD's request for
such recordings if there are no U. S. Steel or contractor personnel depicted in the video
recordings.  If U. S. Steel or contractor personnel are depicted in the video recordings, then
U. S. Steel shall make video recordings downloadable or transferable to ACHD within ten
business days of ACHD's request for such recordings.  Video recordings requested by ACHD

24

within the 30-day rolling period shall be maintained by U. S. Steel until such time as the recordings are downloaded or transferred to ACHD.

39.     U. S. Steel shall use the video camera system as a tool to minimize emissions by ensuring that processes are optimized and allowing its operators to monitor the applicable areas so as to recognize and react to potentially non-compliant Visible Emissions by taking corrective actions to minimize or eliminate any such emissions as expeditiously as possible. The parties agree that the cameras were not installed to determine compliance or noncompliance with Article XXI § 2104.01 because the video cameras (and any still shots taken therefrom) do not meet the criteria to determine opacity as required by EPA Method 9 or other approved EPA methods. Within 120 Days after the installation of the video camera system required by Paragraph 37, U. S. Steel shall have incorporated the use of the video cameras into a standard operating procedure. The standard operating procedure shall provide for continuous operation of the cameras during all daylight hours to the extent technically practicable and consistent with manufacturer maintenance recommendations. U. S. Steel shall also train its operators on use of the video camera system using the standard operating procedure and any applicable provisions of the Facility's Operation and Maintenance Plan within 120 Days of installation of the video camera system required by Paragraph 37.

40.     <u>Pre-Study VEOs for Blast Furnace Casthouses and BOP Shop</u>. Within 30 Days after the Effective Date, U. S. Steel shall ensure that a third-party observer, trained and certified in accordance with EPA Method 9, conducts Visible Emissions readings covering the Casthouse Roof Monitors, BOP Shop Roof Monitor, and BOP Shop Scrubber Stacks in accordance with the procedures in the Facility's Title V Permit and EPA Method 9, as provided in this Paragraph.

            a.      For any Week in which there are no planned or unplanned outages, the

25

Method 9 Visible Emissions observations shall be completed as provided below:

| Source | Per Week |
|---|---|
| Blast Furnace No. 1 Casthouse Roof Monitor, that includes at least one cast cycle (from tap to plug) per observation | Two Days |
| Blast Furnace No. 3 Casthouse Roof Monitor, that includes at least one cast cycle (from tap to plug) per observation | Two Days |
| BOP Shop Roof Monitor—Minimum of a two-hour observation that includes at least one Steel Production Cycle | Two Days |
| BOP Shop Scrubber Stacks—Minimum of a two-hour observation that includes at least one Steel Production Cycle | Two Days |

b.      No later than Thursday of each Week, U. S. Steel shall provide ACHD with a schedule of the Days Method 9 Visible Emission readings will be taken at the Facility during the following Week, to allow ACHD staff or an ACHD contractor to be present for the readings and, as necessary, perform ACHD's own observations to verify compliance.  U. S. Steel shall notify ACHD of any planned outage that will affect the above schedule in the weekly notice of planned Method 9 Visibility Emissions observations.

c.      U. S. Steel shall promptly notify ACHD regarding any planned or unplanned outage that would foreclose U. S. Steel from satisfying any requirement, including the required frequency and/or duration, of the Method 9 Visible Emissions observations required in Paragraph 40.a, and shall make best efforts to reschedule such readings, where reasonably possible, so as to complete the total number of weekly Method 9 Visible Emissions readings required by Paragraph 40.a.

d.      In the event that a Method 9 Visible Emissions observation indicates opacity levels exceeding any applicable opacity limit, U. S. Steel shall

conduct Method 9 readings for at least the next two hours or until daylight

conditions allow; or until Method 9 readings indicate opacity levels that

do not exceed any applicable opacity limit.

e.      U. S. Steel may invoke Dispute Resolution under Section IX (Dispute

Resolution) for any Method 9 Visible Emissions observations performed

by ACHD or EPA pursuant to this Paragraph.

f.      The requirement to perform Method 9 Visible Emissions observations

pursuant to this Paragraph shall be superseded by the requirements of

Paragraph 41 beginning 30 Days after U. S. Steel submits the notices of

completion required by Paragraphs 21, 28, and 35.

41.      <u>Post-Study VEOs for Blast Furnace Casthouses and BOP Shop</u>. Within 30 Days

after U. S. Steel submits the notices of completion required by Paragraphs 21, 28, and 35, and

continuing for at least the first four months after the submittal of such notices of completion,

U. S. Steel shall ensure that a third-party observer, trained and certified in accordance with EPA

Method 9, conducts Visible Emissions readings covering the Casthouse Roof Monitors, BOP

Shop Roof Monitor, and BOP Shop Scrubber Stacks in accordance with the procedures in the

Facility's Title V Permit and EPA Method 9, as provided in this Paragraph.

a.      For any Week in which there are no planned or unplanned outages, the

Method 9 Visible Emissions observations shall be completed as provided

below:

| Source | Per Week |
|---|---|
| Blast Furnace No. 1 Casthouse Roof Monitor, that includes at least one cast cycle (from tap to plug) per observation | Four Days |
| Blast Furnace No. 3 Casthouse Roof Monitor, that includes at least one cast cycle (from tap to plug) per observation | Four Days |
| BOP Shop Roof Monitor—Minimum of a two-hour observation that includes at least one Steel Production Cycle | Four Days |
| BOP Shop Scrubber Stacks—Minimum of a two-hour observation that includes at least one Steel Production Cycle | Four Days |

b.      No later than Thursday of each Week, U. S. Steel shall provide ACHD with a schedule of the Days Method 9 Visible Emission readings will be taken at the Facility during the following Week, to allow ACHD staff or an ACHD contractor to be present for the readings and, as necessary, perform ACHD's own observations to verify compliance.  U. S. Steel shall notify ACHD of any planned outage that will affect the above schedule in the weekly notice of planned Method 9 Visibility Emissions observations

c.      U. S. Steel shall promptly notify ACHD regarding any planned or unplanned outage that would foreclose U. S. Steel from satisfying any requirement, including the required frequency and/or duration, of the Method 9 Visible Emissions observations required in Paragraph 41.a, and shall make best efforts to reschedule such readings, where reasonably possible, so as to complete the total number of weekly Method 9 Visible Emissions readings required by Paragraph 41.a.

d.      In the event that a Method 9 Visible Emissions observation indicates opacity levels exceeding any applicable opacity limit, U. S. Steel shall conduct Method 9 readings for at least the next two hours or until daylight

28

conditions allow; or until Method 9 readings indicate opacity levels that do not exceed any applicable opacity limit.

e.    U. S. Steel may invoke Dispute Resolution under Section IX (Dispute Resolution) for any Method 9 Visible Emissions observations performed by ACHD or EPA pursuant to this Paragraph.

f.    The requirement to perform the scheduled Method 9 Visible Emissions observations pursuant to this Paragraph for the Blast Furnace Casthouse shall cease at the occurrence of the sooner of: (i) if the required Visible Emissions observations show a compliance rate of 100 percent for four consecutive months at the Blast Furnace No. 1 Casthouse Roof Monitor and the Blast Furnace No. 3 Casthouse Roof Monitor; or (ii) twelve months of collecting Post-Study VEOs.

g.    The requirement to perform the scheduled Method 9 Visible Emissions observations pursuant to this Paragraph for the BOP Shop Roof Monitor shall cease at the occurrence of the sooner of: (i) if the required Visible Emissions observations show a compliance rate of 100 percent for four consecutive months at the BOP Shop Roof Monitor; or (ii) twelve months of collecting Post-Study VEOs.

h.    The requirement to perform the scheduled Method 9 Visible Emissions observations pursuant to this Paragraph for the BOP Shop Scrubber Stack shall cease at the occurrence of the sooner of: (i) if the required Visible Emissions observations show a compliance rate of 100 percent for four

29

consecutive months at the BOP Shop Scrubber Stack; or (ii) twelve

months of collecting Post-Study VEOs.

42.     U. S. Steel shall generate a report for each Method 9 reading required by this

Consent Decree. The report shall include the operation conditions in the Blast Furnace Casthouse

and/or BOP Shop, as applicable, including but not limited to which furnaces were operating; how

many baghouse compartments were in use; and general weather conditions.

43.     In addition to the semi-annual reports required pursuant to Section VI (Reporting

Requirements), U. S. Steel shall submit to EPA and ACHD quarterly reports of its compiled

Method 9 Visible Emissions observations. The quarterly reports shall identify any deviation(s)

from the applicable opacity standards at ACHD Rules and Regulations, Article XXI, §§ 2104.01

and 2105.49, the likely cause of such deviations(s), corrective measure(s) taken to address the

deviation(s), and the effectiveness of such corrective measures as can be determined at the time

of the report.

44.     If U. S. Steel implements a digital camera opacity technique ("DCOT") system

pursuant to the Integrated Iron and Steel MACT, 40 C.F.R. Part 63, Subpart FFFFF, U. S. Steel

may use the DCOT system to satisfy the Method 9 obligations of this Consent Decree.

45.     Blast Furnace Slag Pits. U. S. Steel shall continue to utilize slag wetting practices

to cool, solidify, and break up the Blast Furnace slag prior to removal, so as to minimize the

release of fugitive PM emissions to the atmosphere. U. S. Steel shall inspect the Slag Pit spray

systems on a once per shift basis, documenting the condition of the slag prior to load-out, and

maintaining associated records pursuant to the Facility's Operation and Maintenance Plan.

46.     To satisfy the requirements of Article XXI, § 2104.04.b, within 60 Days of the

Effective Date, U. S. Steel shall begin feeding an oxidizing chemical additive or additives such

as, but not limited to, potassium permanganate or hydrogen peroxide into the Slag Pit quench

water spray system, to enhance suppression of $H_2S$ emissions at the Slag Pit. Within 90 Days of

the start of this initial period, which may rely on temporary hoses and local controls, U. S. Steel

shall submit to EPA and ACHD for approval pursuant to Paragraph 57 (Approval of

Deliverables), proposed written procedures for the Slag Pit that require:

      a.      Pouring practices that achieve the thinnest uniform slag layers practicable;

      b.      Slag Pit filling schedules that maximize the air-cooling time between subsequent slag pours over a given surface and the air-cooling time prior to the quenching of slag with water;

      c.      Schedule for implementation and description of systems for distributing quench water uniformly over the slag surface at rates sufficiently high to minimize or prevent the evolution of $H_2S$;

      d.      Excavation of Slag Pits in such a way as to achieve the maximum practicable volume and/or surface area;

      e.      Schedule for implementation and description of operation and maintenance of a permanent system for suppression of $H_2S$ emissions by use of a potassium permanganate or hydrogen peroxide (or equivalently effective chemical as approved by ACHD) feed system, which shall feed into the Slag Pit quench water spray system; and

      f.      Daily records of the operational status of the quench water spray system and chemical feed system, and weekly records of the quantity of chemical additive employed in the quench water spray system.

U. S. Steel shall thereafter implement the Slag Pit actions in accordance with the approved procedures submitted in accordance with this Paragraph, and shall continue to use any temporary $H_2S$ suppression system until installation and operation of the approved permanent system.

47.   <u>$SO_2$ CEMS for Riley Boilers</u>.

      a.     Within 90 Days after the Effective Date, U. S. Steel shall submit a monitoring plan in the Pennsylvania Department of Environmental Protection ("Pennsylvania DEP") CEM Data Processing System ("CEMDPS") to install $SO_2$ CEMS to continuously measure $SO_2$ emissions from the Riley Boilers. U. S. Steel's monitoring plan shall contain the information required in the Initial Application (Phase 1) Section of the latest version (currently revision 8) of the Continuous Source Monitoring Manual ("Manual"). U. S. Steel shall notify ACHD and EPA that submission has occurred in the CEMDPS within five Days following submission.

      b.     U. S. Steel shall comply with all relevant requirements of the latest version (currently revision 8) of the Pennsylvania DEP's Manual.

      c.     Performance testing (Phase 2) of the $SO_2$ CEMS must be completed within 210 Days after the Effective Date, or within 90 Days after Pennsylvania DEP approval of Phase 1, whichever is later. A notification must be submitted to Pennsylvania DEP, EPA, and ACHD within 10 Days following completion of performance testing.

      d.     U. S. Steel shall submit a report to Pennsylvania DEP through the CEMDPS verifying the monitoring system's compliance with all

regulatory requirements. This shall be done within 60 Days of completion

of testing.

e.      Upon certification and approval by the Pennsylvania DEP of the $SO_2$

CEMS for the Riley Boilers, hourly emissions data must be submitted to

the Pennsylvania DEP thorough the CEMDPS starting with the hour

following the completion of performance specification testing. Emissions

data will be submitted on a quarterly basis and adhere to the Record

Keeping and Reporting requirements of the Manual and in the

Pennsylvania DEP certification approval letter.

f.      The $SO_2$ CEMS for the Riley Boilers shall be operated and maintained in

accordance with the Quality Assurance section of the Manual.


C. MAINTENANCE PRACTICES


48.     <u>Maintenance Practices Audits</u>. U. S. Steel has retained and EPA, after

consultation with ACHD, has approved, a third-party auditor to conduct a Maintenance Practices

Audit pursuant to Paragraphs 50 and 51. U. S. Steel shall bear all costs associated with the

Maintenance Practices Auditor, cooperate fully with the Maintenance Practices Auditor, and

provide the Maintenance Practices Auditor with access to all records, employees, contractors,

and areas of the Facility that the Maintenance Practices Auditor deems reasonably necessary to

effectively perform the duties described in Paragraphs 50 and 51.

49.     <u>Selection of Replacement Maintenance Practices Auditor</u>. If at any time

U. S. Steel seeks to replace the Maintenance Practices Auditor, U. S. Steel shall submit to EPA

and ACHD a list of two or more proposed Maintenance Practices Auditors who have experience

and competence in evaluating emission control maintenance practices for compliance with CAA requirements at industrial facilities. The proposed Maintenance Practices Auditors must have no direct financial stake in the outcome of the Maintenance Practices Audit conducted pursuant to this Consent Decree. U. S. Steel shall disclose to EPA and ACHD any past or existing contractual or financial relationship with the proposed Maintenance Practices Auditors when the proposed Maintenance Practices Auditors are identified.

  a. EPA, in consultation with ACHD, shall notify U. S. Steel of whether it approves any Maintenance Practices Auditors on the list submitted by U. S. Steel. If EPA, after consultation with ACHD, does not approve any of the proposed Maintenance Practices Auditors, then U. S. Steel shall submit another list of proposed auditors to EPA and ACHD within 30 Days of receipt of EPA's written notice. If after U. S. Steel has submitted a third list of proposed Maintenance Practices Auditors, which must be submitted within 30 Days of receipt of written notice that EPA has not approved any of the Maintenance Practices Auditors on U. S. Steel's second list, the Parties are unable to agree on an auditor, the Parties agree to resolve the selection of the Maintenance Practices Auditor through the procedures in Section IX (Dispute Resolution).

  b. Within 30 Days after U. S. Steel receives notice of EPA's approval, U. S. Steel shall retain one Maintenance Practices Auditor from those approved by EPA, to perform the duties described in Paragraphs 50 and 51.

50.   <u>Scope of the Maintenance Practices Audit</u>. U. S. Steel shall direct the Maintenance Practices Auditor to perform an audit to analyze operation and maintenance practices for emissions controls, including the adequacy of the effective O&M Plan, as applicable, current version attached as Appendix B, and U. S. Steel's implementation of the O&M Plan. The emissions controls to be covered by the Maintenance Practices Audit shall include:

    a.    the Casthouse Baghouse;

    b.    the BOP Shop Fugitive Baghouse;

    c.    the BOP Shop Mixer Baghouse;

    d.    the BOP Shop LMF Baghouse;

    e.    the BOP Shop Primary Emissions System/BOP Shop Scrubber; and

    f.    the Slag Pits.

51.   U. S. Steel shall direct the Maintenance Practices Auditor to prepare a report which shall be submitted to U. S. Steel within 180 Days of the Effective Date. The report shall contain:

    a.    a summary of the audit process, including any obstacles encountered;

    b.    detailed audit findings, including the basis for each finding and each area of concern related to:

        (1)    The adequacy of the effective O&M Plan for ensuring current and continued future functioning of emissions controls and compliance with applicable emission limitations;

        (2)    The adequacy of the Facility-Wide Asset Tree for ensuring current and continued future functioning of emissions controls and

35

compliance with applicable emission limitations;

(3)      Whether requirements, targets, objectives, or other benchmarks identified in Paragraph 50 are being achieved;

(4)      Whether there are examples of noncompliance with the written O&M Plan;

(5)      Recommendations for resolving any area of concern or otherwise achieving compliance with the written O&M Plan;

c.      A certification by U. S. Steel and the Maintenance Practices Auditor that the audit was performed in accordance with the provisions of this Consent Decree.

52.      Within 60 Days of U. S. Steel's receipt of the Maintenance Practices Auditor's report, U. S. Steel shall submit to EPA and ACHD pursuant to Paragraph 57 (Approval of Deliverables): (a) a copy of the report, and (b) a plan for approval which includes a proposal for implementing any recommendations in the report.

53.      U. S. Steel shall thereafter implement the proposed actions in accordance with the schedule in the approved plan, and shall ensure that its employees are properly trained to implement the proposed actions.

54.      <u>Subsequent Self-Audits</u>. Beginning no later than 12 months after EPA's approval of the Maintenance Practices Auditor's report pursuant to Paragraph 52, U. S. Steel shall perform a self-audit of its O&M practices once every twelve months in accordance with the same scope and protocol used by the Maintenance Practices Auditor as set forth in Paragraph 50.

55.     Within 30 Days of U. S. Steel's completion of the self-audit, U. S. Steel shall submit to EPA and ACHD pursuant to Paragraph 57 (Approval of Deliverables) a report for approval that identifies:

      a.     A summary of the audit process, including any obstacles encountered;

      b.     Detailed audit findings, including the basis for each finding and each area of concern related to:

          (1)     The adequacy of the effective O&M Plan for ensuring current and continued future functioning of emissions controls and compliance with applicable emission limitations;

          (2)     The adequacy of the Facility-Wide Asset Tree for ensuring current and continued future functioning of emissions controls and compliance with applicable emission limitations;

          (3)     Whether requirements, targets, objectives, or other benchmarks identified in Paragraph 50 are being achieved;

          (4)     Whether there are examples of noncompliance with the written O&M Plan;

          (5)     Recommendations and a schedule for resolving any area of concern or otherwise achieving compliance with the written O&M Plan;

      c.     A certification by U. S. Steel that the audit was performed in accordance with the provisions of this Consent Decree.

56.     U. S. Steel shall thereafter implement the proposed actions in accordance with the schedule in the approved report.

57.     <u>Approval of Deliverables</u>. After review of any plan, report, or other item that is required to be submitted pursuant to this Consent Decree, EPA, after consultation with ACHD, will in writing: (a) approve the submission; (b) approve the submission upon specified conditions; (c) approve part of the submission and disapprove the remainder; or (d) disapprove the submission.

58.     If the submission is approved pursuant to Paragraph 57(a), U. S. Steel shall take all actions required by the plan, report, or other document, in accordance with the schedules and requirements of the plan, report, or other document, as approved. If the submission is conditionally approved or approved only in part pursuant to Paragraph 57(b) or (c), U. S. Steel shall, upon written direction from EPA (after consultation with ACHD), take all actions required by the approved plan, report, or other item that EPA, after consultation with ACHD, determines are technically severable from any disapproved portions, subject to U. S. Steel's right to dispute only the specified conditions or the disapproved portions under Section IX (Dispute Resolution).

59.     If the submission is disapproved in whole or in part pursuant to Paragraph 57(c) or (d), U. S. Steel shall, within 30 Days or such other time as the Parties agree to in writing, correct all deficiencies and resubmit the plan, report, or other item, or disapproved portion thereof, for approval, in accordance with the preceding Paragraphs. If the resubmission is approved in whole or in part, U. S. Steel shall proceed in accordance with the preceding Paragraph.

60.     Any stipulated penalties applicable to the original submission, as provided in Section VII (Stipulated Penalties), accrue during the 30 Day period or other specified period, but shall not be payable unless the resubmission is untimely or is disapproved in whole or in part; provided that, if the original submission was so deficient as to constitute a material breach of

U. S. Steel's obligations under this Decree, the stipulated penalties applicable to the original submission shall be due and payable notwithstanding any subsequent resubmission.

61.     If a resubmitted plan, report, or other item, or portion thereof, is disapproved in whole or in part, EPA, after consultation with ACHD, may again require U. S. Steel to correct any deficiencies, in accordance with the preceding Paragraphs, subject to U. S. Steel's right to invoke Dispute Resolution and the right of EPA and ACHD to seek stipulated penalties as provided in the preceding Paragraphs.

62.     If U. S. Steel elects to invoke Dispute Resolution as set forth in Paragraphs 58 or 61, U. S. Steel shall do so by sending a Notice of Dispute in accordance with Paragraph 92 (Informal Dispute Resolution) within 30 Days (or such other time as the Parties agree to in writing) after receipt of the applicable decision.

63.     Permits. Where any compliance obligation under this Section requires U. S. Steel to obtain a federal, state, or local permit or approval, U. S. Steel shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals. U. S. Steel may seek relief under the provisions of Section VIII (Force Majeure) for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if U. S. Steel has submitted timely and complete applications and has taken all other actions necessary to obtain all such permits or approvals.

## VI.     REPORTING REQUIREMENTS

64.     Within 10 Days after the Effective Date, U. S. Steel shall submit to EPA and ACHD for review a list of deadlines included in this Consent Decree. For any deliverable required by the Consent Decree, the list shall indicate whether EPA and ACHD approval is

required. The list shall be in substantially the same form as Appendix C and shall be submitted in

an electronic format (e.g., unlocked spreadsheet or similar format agreed to by the Parties).

Within 10 Days of modification of any deadline under this Consent Decree, U. S. Steel shall

provide an updated list reflecting changes to the future schedule. In the event of conflict between

the list generated pursuant to this Paragraph and the Consent Decree, the Consent Decree shall

control.

65.     U. S. Steel shall submit the following semi-annual reports to EPA and ACHD at

the addresses set forth in Section XIII (Notices):

a.     By February 28th and August 31st of each year after the lodging of this

Consent Decree, until termination of this Decree pursuant to Section XVII (Termination),

U. S. Steel shall submit a semi-annual report for the preceding six months that includes:

(1)     Identification of work performed and progress made toward

implementing the requirements of Section V (Compliance

Requirements), including a narrative description of activities

undertaken, the status of any compliance measures, the completion

of any milestones, and problems encountered or anticipated,

together with implemented or proposed solutions;

(2)     A description of the efforts, results, and achievements of the

Environmental Awareness Training required by Paragraph 36;

(3)     All reports, data sheets, and other information required in

Paragraphs 40, 41, and 42 regarding emissions monitoring;

(4)     Any changes to the Facility's Operation and Maintenance Plan

made in the preceding six months, along with the justification for

40

any such changes.

   b. The report shall also include a description of any non-compliance with the requirements of this Consent Decree and an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation. If the cause of the non-compliance cannot be fully explained at the time the report is due, U. S. Steel shall so state in the report. U. S. Steel shall investigate the cause of the non-compliance and shall then submit an amendment to the report, including a full explanation of the cause of the non-compliance, within 30 Days of the Day U. S. Steel becomes aware of the cause of the non-compliance. Nothing in this Paragraph or the following Paragraph relieves U. S. Steel of its obligation to provide the notice required by Section VIII (Force Majeure).

   66. Whenever any violation of this Consent Decree or any other event affecting U. S. Steel's performance under this Decree, or the performance of its Facility, may pose an immediate threat to the public health or welfare or the environment, U. S. Steel shall notify EPA and ACHD orally or electronically as soon as possible, but no later than 24 hours after U. S. Steel first knew of the violation or event. This procedure is in addition to the requirements set forth in the preceding Paragraph.

   67. Each report submitted by U. S. Steel under this Section shall be signed by an official of the submitting party and include the following certification:

   I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete.  I have no personal knowledge that the information submitted is other than true, accurate, and complete. I am aware that there are significant

penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

68.     This certification requirement does not apply to emergency or similar notifications where compliance would be impractical.

69.     The reporting requirements of this Consent Decree do not relieve U. S. Steel of any reporting obligations required by the Act or implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement.

70.     Any information provided pursuant to this Consent Decree may be used by Plaintiffs in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

## VII.     STIPULATED PENALTIES

71.     U. S. Steel shall be liable for stipulated penalties to the United States and ACHD for violations of this Consent Decree as specified below, unless excused under Section VIII (Force Majeure). A violation includes failing to perform any obligation required by the terms of this Decree, including any work plan or schedule approved under this Decree, according to all applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.

72.     <u>Late Payment of Civil Penalty</u>. If U. S. Steel fails to pay the civil penalty required to be paid under Section IV (Civil Penalty) when due, U. S. Steel shall pay a stipulated penalty of $1,000 per Day, per Plaintiff not fully paid, for each Day that the payment is late.

73.     The following stipulated penalties shall accrue for violations of ACHD Rules and Regulations, Article XXI, §§ 2104.01 and 2105.49, at the Facility's BOP Shop, BOP Shop Scrubber Stack, and Blast Furnace Casthouses:

a.     For violations that occur prior to U. S. Steel's submittal of the notices of

42

completion required by Paragraphs 21, 28, and 35:

| Penalty Per Day of Violation | Number of Exceedances |
|---|---|
| $500 | 1-5 Exceedances/Day |
| $1,000 | 6-10 Exceedances/Day |
| $1,500 | 11+ Exceedances/Day |

      b.     For violations that occur after U. S. Steel's submittal of the notices of

completion required by Paragraphs 21, 28, and 35:

| Penalty Per Day of Violations | Number of Exceedances |
|---|---|
| $1,500 | 1-5 Exceedances/Day |
| $3,000 | 6-10 Exceedances/Day |
| $4,500 | 11+ Exceedances/Day |

74.     Submittal of Notices, Plans, Procedures, Proposals, Protocols, Performance Tests, Reports, and Studies: The following stipulated penalties shall accrue per violation per Day for each failure to submit a notice, plan, procedure, proposal, protocol, performance test, report, or study as required by Paragraphs 15 to 21 (submittals for Casthouse Baghouse System), 22 to 28 (submittals for BOP Shop Roof Ventilation), 29 to 35 (submittals for BOP Shop Scrubber System), 46 (submittals for slag pit), 47 (submittals for $SO_2$ CEMS), 48 to 49 (submittals for Maintenance Practices Auditor), 52 (submittal of Maintenance Practices Auditor's report and implementation plan), and 55 (submittal of maintenance self-audit reports):

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $750 | 1st through 14th Day |
| $1,500 | 15th through 30th Day |
| $3,250 | 31st Day and beyond |

75.     Implementation of Compliance Requirements. The following stipulated penalties shall accrue per violation per Day for each failure to implement a compliance requirement in

43

accordance with the requirements of this Consent Decree, as required by Paragraphs 15 to 21 (performance of Casthouse Baghouse System study, and implementation of approved Casthouse Baghouse improvements), 22 to 28 (performance of BOP Shop Roof Ventilation study, and implementation of approved BOP Shop ventilation improvements), 29 to 35 (performance of BOP Shop Scrubber System study, and implementation of approved BOP Shop Scrubber System improvements), 36 (implementation of Environmental Awareness Training), 37 to 39 (installation, maintenance, and use of emissions surveillance and process optimization cameras), 40 to 41 (performance of Pre-Study and Post-Study VEO Method 9 readings at the Blast Furnace Casthouses and BOP Shop except stipulated penalties shall not accrue for any Day(s) or period(s) of time in which the Facility's Blast Furnace(s), BOP Shop, BOP Shop Scrubber Stack, as applicable, is not operating), 45 to 46 (Slag Pit practices), 47 (operation and maintenance of $SO_2$ CEMs), 48 to 49 (hiring and cooperation with Maintenance Practices Auditor), 50 (performance of third-party Maintenances Practices Audit), 51 (completion of third-party Maintenance Practices Audit report), 53 (implementation of approved third-party maintenance practices improvements), 54 (performance of maintenance self-audits), and 56 (implementation of approved self-audit maintenance practices improvements):

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $1,250 | 1st through 14th Day |
| $2,500 | 15th through 30th Day |
| $4,500 | 31st Day and beyond |

76.     Reporting and Recordkeeping Requirements. The following stipulated penalties shall accrue per violation per Day for each violation of the reporting and recordkeeping requirements identified in Paragraphs 12 (ACHD-Only SEP), 38 (maintain and provide recordings of emissions surveillance cameras), 42 (Method 9 reading reports), 43 (quarterly

reports), 64 (schedule of deadlines and deliverables), 65 (general reporting requirements), 66 (immediate threat to the public health or welfare or the environments), and 67 (compliance certifications):

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $500 | 1st through 14th Day |
| $1,000 | 15th through 30th Day |
| $2,000 | 31st Day and beyond |

77.     <u>Stipulated Penalties for ACHD-Only Supplemental Environmental Project</u>.

a.      Subject to subparagraph (b) below, if U. S. Steel fails to satisfactorily complete the ACHD-Only SEP set forth in Paragraph 12 and Appendix A, U. S. Steel shall pay stipulated penalties to ACHD in the following amounts for each Day after the deadline:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $1,000 | 1st through 14th Day |
| $2,000 | 15th through 30th Day |
| $4,000 | 31st Day and beyond |

b.      If U. S. Steel fails to expend the entire amount of the required expenditure for the ACHD-Only SEP but otherwise has satisfactorily completed the project, U. S. Steel shall pay a stipulated penalty equal to 100% of the difference between the required expenditure for the project and any eligible project dollar amounts expended to implement the project in accordance with Paragraph 12 and Appendix A.

78.     If any approved report submitted under this Consent Decree contains a compliance schedule with interim compliance dates, stipulated penalties for deviations from interim compliance dates shall accrue but not be owed if the final compliance date is met.

Stipulated penalties shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

79.     U. S. Steel shall pay stipulated penalties to the United States and ACHD within 30 Days of a written demand by either Plaintiff. U. S. Steel shall pay 50 percent of the total stipulated penalty amount due to the United States and 50 percent to ACHD. The Plaintiff making a demand for payment of a stipulated penalty shall simultaneously send a copy of the demand to the other Plaintiff, and where ACHD is the demanding Plaintiff, ACHD shall also send notice of such stipulated penalty demand to:

> a.     U.S. EPA Cincinnati Finance Office, via email at
>
>        CINWD_AcctsReceivable@epa.gov; and
>
> b.     EPA Region III, via email to the U.S. EPA Region III Regional Hearing
>
>        Clerk at R3_Hearing_Clerk@epa.gov.

80.     Either Plaintiff may in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree.

81.     Stipulated penalties shall continue to accrue as provided in Paragraph 77, during any Dispute Resolution, but need not be paid until the following:

> a.     If the dispute is resolved by agreement of the Parties or by a decision of
>
> EPA or ACHD that is not appealed to the Court, U. S. Steel shall pay accrued penalties
>
> determined to be owing, together with interest at the rate specified in 28 U.S.C. § 1961,
>
> to the United States or ACHD within 30 Days of the effective date of the agreement or
>
> the receipt of EPA's or ACHD's decision or order.

b.      If the dispute is appealed to the Court and the United States or ACHD prevails in whole or in part, U. S. Steel shall pay all accrued penalties determined by the Court to be owing, together with interest at the rate specified in 28 U.S.C. § 1961, within 60 Days of receiving the Court's decision or order, except as provided in subparagraph c, below.

c.      If any Party appeals the District Court's decision, U. S. Steel shall pay all accrued penalties determined to be owing, together with interest at the rate specified in 28 U.S.C. § 1961, within 15 Days of receiving the final appellate court decision.

82.      U. S. Steel shall pay stipulated penalties owing to the United States in the manner set forth in Paragraph 10 and with the confirmation notices required by Paragraph 11, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid, and U. S. Steel shall simultaneously send notice of such stipulated penalty payment to the email addresses identified in Paragraph 79.a and 79.b. U. S. Steel shall pay stipulated penalties owing to ACHD by corporate or certified check, or the like, made payable to the "Allegheny County Clean Air Fund," and sent to Air Quality Program Manager, Allegheny County Health Department, 301 39th Street, Bldg. #7, Pittsburgh, PA 15201.

83.      If U. S. Steel fails to pay stipulated penalties according to the terms of this Consent Decree, U. S. Steel shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall be construed to limit the United States or ACHD from seeking any remedy otherwise provided by law for U. S. Steel's failure to pay any stipulated penalties.

84.     The payment of penalties and interest, if any, shall not alter in any way

U. S. Steel's obligation to complete the performance of the requirements of this Consent Decree.

85.     <u>Non-Exclusivity of Remedy</u>. Stipulated penalties are not the Plaintiffs' exclusive

remedy for violations of this Consent Decree. Subject to the provisions of Section XI (Effect of

Settlement/Reservation of Rights), the United States and ACHD expressly reserve the right to

seek any other relief they deem appropriate for U. S. Steel's violation of this Decree or

applicable law, including but not limited to an action against U. S. Steel for statutory penalties,

additional injunctive relief, mitigation or offset measures, and/or contempt.  However, the

amount of any statutory penalty assessed for a violation of this Consent Decree shall be reduced

by an amount equal to the amount of any stipulated penalty assessed and paid pursuant to this

Consent Decree.

<div align="center">VIII.   FORCE MAJEURE</div>

86.     "Force majeure," for purposes of this Consent Decree, is defined as any event

arising from causes beyond the control of U. S. Steel, of any entity controlled by U. S. Steel, or

of U. S. Steel's contractors, that delays or prevents the performance of any obligation under this

Consent Decree despite U. S. Steel's best efforts to fulfill the obligation. The requirement that

U. S. Steel exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate

any potential force majeure event and best efforts to address the effects of any potential force

majeure event (a) as it is occurring and (b) following the potential force majeure, such that the

delay and any adverse effects of the delay are minimized. "Force Majeure" does not include

U. S. Steel's financial inability to perform any obligation under this Consent Decree.

87.     If any event occurs or has occurred that may delay the performance of any

obligation under this Consent Decree, whether or not caused by a force majeure event, U. S.

<div align="center">48</div>

Steel shall provide written notice to EPA and ACHD within seven Days of when U. S. Steel first knew that the event might cause a delay. The notice shall include an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; U. S. Steel's rationale for attributing such delay to a force majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of U. S. Steel, such event may cause or contribute to an endangerment to public health, welfare or the environment. U. S. Steel shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure. Failure to comply with the above requirements shall preclude U. S. Steel from asserting any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. U. S. Steel shall be deemed to know of any circumstance of which U. S. Steel, any entity controlled by U. S. Steel, or U. S. Steel's contractors knew or should have known.

88.     If EPA, after a reasonable opportunity for review and comment by ACHD, agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by EPA, after a reasonable opportunity for review and comment by ACHD, for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation. EPA will notify U. S. Steel in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

89.     If EPA, after a reasonable opportunity for review and comment by ACHD, does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, EPA will notify U. S. Steel in writing of its decision.

90.     If U. S. Steel elects to invoke the dispute resolution procedures set forth in Section IX (Dispute Resolution), it shall do so no later than 15 Days after receipt of EPA's notice. In any such proceeding, U. S. Steel shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that U. S. Steel complied with the requirements of Paragraphs 86 and 87. If U. S. Steel carries this burden, the delay at issue shall be deemed not to be a violation by U. S. Steel of the affected obligation of this Consent Decree identified to EPA and the Court.

IX.     DISPUTE RESOLUTION

91.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. U. S. Steel's failure to seek resolution of a dispute under this Section shall preclude U. S. Steel from raising any such issue as a defense to an action by the Plaintiffs to enforce any obligation of U. S. Steel arising under this Decree.

92.     <u>Informal Dispute Resolution</u>. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when U. S. Steel sends the United States and ACHD a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed 20 Days from the date the dispute arises, unless that

period is modified by written agreement. If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless, within 30 Days after the conclusion of the informal negotiation period, U. S. Steel invokes formal dispute resolution procedures as set forth below.

93.     Formal Dispute Resolution. U. S. Steel shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by sending the United States and ACHD a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting U. S. Steel's position and any supporting documentation relied upon by U. S. Steel.

94.     The United States, after consultation with ACHD, will send U. S. Steel its Statement of Position within 45 Days of receipt of U. S. Steel's Statement of Position. The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States. The United States' Statement of Position is binding on U. S. Steel, unless U. S. Steel files a motion for judicial review of the dispute in accordance with the following Paragraph.

95.     Judicial Dispute Resolution. U. S. Steel may seek judicial review of the dispute by filing with the Court and serving on the United States a motion requesting judicial resolution of the dispute. The motion must be filed within 30 Days of receipt of the United States' Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of U. S. Steel's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

51

96.     The United States shall respond to U. S. Steel's motion within the time period allowed by the Local Rules of this Court. U. S. Steel may file a reply memorandum, to the extent permitted by the Local Rules.

97.     Standard of Review. Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 93, U. S. Steel shall bear the burden of demonstrating that its position complies with this Consent Decree, and that U. S. Steel is entitled to relief under applicable principles of law. The United States reserves the right to argue that its position is reviewable only on the administrative record and must be upheld unless arbitrary and capricious or otherwise not in accordance with law, and Defendant reserves the right to oppose this position.

98.     The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of U. S. Steel under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 81. If U. S. Steel does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section VII (Stipulated Penalties).

X.      INFORMATION COLLECTION AND RETENTION

99.     The United States, ACHD, and their representatives, including attorneys, contractors, and consultants, shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times, upon presentation of credentials, to:

        a.      monitor the progress of activities required under this Consent Decree;

b. verify any data or information submitted to the United States or ACHD in accordance with the terms of this Consent Decree;

c. obtain samples and, upon request, splits of any samples taken by U. S. Steel or its representatives, contractors, or consultants;

d. obtain documentary evidence, including photographs and similar data; and

e. assess U. S. Steel's compliance with this Consent Decree.

100. Until five years after the termination of this Consent Decree, U. S. Steel shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that relate in any manner to U. S. Steel's performance of its obligations under this Consent Decree. This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures. At any time during this information-retention period, upon request by the United States or ACHD, U. S. Steel shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

101. At the conclusion of the information-retention period provided in the preceding Paragraph, U. S. Steel shall notify the United States and ACHD at least 90 Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the United States or ACHD, U. S. Steel shall deliver any such documents, records, or other information to EPA or ACHD. U. S. Steel may assert that certain documents, records, or other information is privileged under the attorney-client privilege or any other privilege recognized by federal law. If U. S. Steel asserts such a privilege, it shall

provide the following: (a) the title of the document, record, or information; (b) the date of the document, record, or information; (c) the name and title of each author of the document, record, or information; (d) the name and title of each addressee and recipient; (e) a description of the subject of the document, record, or information; and (f) the privilege asserted by U. S. Steel. However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

102.    U. S. Steel may also assert that information required to be provided under this Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2. As to any information that U. S. Steel seeks to protect as CBI, U. S. Steel shall follow the procedures set forth in 40 C.F.R. Part 2.

103.    This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or ACHD pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of U. S. Steel to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

## XI.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

104.    This Consent Decree resolves the civil claims of the United States and ACHD for the violations alleged in the Complaint filed in this action, and those alleged in EPA's November 9, 2017 NOV No. CAA-III-18-0002; ACHD's Notices of Violation Nos. 160402, 160802, 161204, and 171101; ACHD's Administrative Order No. 180706; alleged observed visible emission exceedances of Article XXI § 2104.01.a on August 22, 2017 and February 26, 2021; and U. S. Steel self-reported deviations of Article XXI § 2104.01.a regarding the Blast Furnaces, BOP Shop Roof Monitor, and BOP Shop Scrubber Stacks, through the date of lodging.

105.     The United States and ACHD reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree. This Consent Decree shall not be construed to limit the rights of the United States or ACHD to obtain penalties or injunctive relief under the Act or implementing regulations, or under other federal or state laws, regulations, or permit conditions, except as expressly specified in Paragraph 104. The United States and ACHD further reserve all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, U. S. Steel's Facility, whether related to the violations addressed in this Consent Decree or otherwise.

106.     In any subsequent administrative or judicial proceeding initiated by the United States or ACHD for injunctive relief, civil penalties, other appropriate relief relating to the Facility, U. S. Steel shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or ACHD in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 104.

107.     This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations. U. S. Steel is responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws, regulations, and permits; and U. S. Steel's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States and ACHD do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that U. S. Steel's compliance with any aspect of this Consent

Decree will result in compliance with provisions of the Act, or with any other provisions of federal, State, or local laws, regulations, or permits.

108.    This Consent Decree does not limit or affect the rights of U. S. Steel or of the United States or ACHD against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against U. S. Steel, except as otherwise provided by law.

109.    This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XII.    COSTS

110.    The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States and ACHD shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by U. S. Steel.

## XIII.   NOTICES

111.    Unless otherwise specified in this Decree, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and sent by mail or email, with a preference for email, addressed as follows:

| | |
|---|---|
| As to DOJ by email (preferred): | eescdcopy.enrd@usdoj.gov<br>Re: DJ # 90-5-2-1-12083 |
| As to DOJ by mail: | EES Case Management Unit<br>Environment and Natural Resources Division<br>U.S. Department of Justice<br>P.O. Box 7611<br>Washington, D.C. 20044-7611<br>Re: DJ # 90-5-2-1-12083 |
| As to EPA by email: | R3_ORC_Mailbox@epa.gov<br>and |

56

<div style="margin-left:40%">

Augustine.Bruce@epa.gov
Re: *U.S. et al. v. U. S. Steel Corporation* (W.D. Pa.)

</div>

As to ACHD by email (preferred):   AQReports@AlleghenyCounty.US

As to ACHD by mail:   Air Quality Program Manager
Allegheny County Health Department
301 39th Street, Bldg. #7
Pittsburgh, PA 15201-1811

As to U. S. Steel:   Environmental Director
Mon Valley Works
United States Steel Corporation
Clairton Plant – MS 71
400 State Street
Clairton, PA 15025

and

United States Steel Corporation
Assistant General Counsel – Environmental
600 Grant Street – Suite 1844
Pittsburgh, PA 15219

112.    Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

113.    Notices submitted pursuant to this Section shall be deemed submitted upon mailing or transmission by email, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

<div style="text-align:center">

XIV.   EFFECTIVE DATE

</div>

114.    The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

<div style="text-align:center">57</div>

## XV.   RETENTION OF JURISDICTION

115.    The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Sections IX (Dispute Resolution) and XVI (Modification), or effectuating or enforcing compliance with the terms of this Decree.

## XVI.   MODIFICATION

116.    The terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by all the Parties. Where the modification constitutes a material change to this Decree, it shall be effective only upon approval by the Court.

117.    Any disputes concerning modification of this Decree shall be resolved pursuant to Section IX (Dispute Resolution), provided, however, that instead of the burden of proof provided by Paragraph 97, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XVII.   TERMINATION

118.    After U. S. Steel has completed the requirements of Section V (Compliance Requirements), has thereafter maintained satisfactory compliance with this Consent Decree for a period of 24 months, and has paid the civil penalty and any accrued stipulated penalties as required by this Consent Decree, U. S. Steel may serve upon the United States and ACHD a Request for Termination, stating that U. S. Steel has satisfied those requirements, together with all necessary supporting documentation.

119.    Following receipt by the United States and ACHD of U. S. Steel's Request for Termination, the Parties shall confer informally concerning the Request and any disagreement

that the Parties may have as to whether U. S. Steel has satisfactorily complied with the requirements for termination of this Consent Decree. If the United States after consultation with ACHD agrees that the Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree.

120.    If the United States after consultation with ACHD does not agree that the Decree may be terminated, U. S. Steel may invoke Dispute Resolution under Section IX (Dispute Resolution). However, U. S. Steel shall not seek Dispute Resolution of any dispute regarding termination until 45 Days after service of its Request for Termination.

## XVIII.  PUBLIC PARTICIPATION

121.    This Consent Decree shall be lodged with the Court for a period of not less than 30 Days for public notice and comment in accordance with 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate. U. S. Steel consents to entry of this Consent Decree without further notice and agrees not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Decree, unless the United States has notified U. S. Steel in writing that it no longer supports entry of the Decree.

## XIX.   SIGNATORIES/SERVICE

122.    Each undersigned representative of U. S. Steel and ACHD, and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

123.     This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis. U. S. Steel agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons. U. S. Steel need not file an answer to the complaint in this action unless or until the Court expressly declines to enter this Consent Decree.

## XX.    INTEGRATION

124.     This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein. Other than deliverables that are subsequently submitted and approved pursuant to this Decree, the Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXI.   FINAL JUDGMENT

125.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States, ACHD, and U. S. Steel.

## XXII.  26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

126.     For purposes of the identification requirement in Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), and 26 C.F.R. § 162-21(b)(2)(iii)(A), performance of:

      a.      Section II (Applicability), Paragraph 5;

      b.      Section V (Compliance Requirements), Paragraphs 15 to 58 and 63;

      c.      Section VI (Reporting Requirements), Paragraphs 64, 65, and 67; and

      d.      Section X (Information Collection and Retention), Paragraphs 99 to 101,

is restitution, remediation, or required to come into compliance with law.

## APPENDICES

127.    The following Appendices are attached to and part of this Consent Decree:

"Appendix A" is the ACHD-Only SEP;

"Appendix B" is the Facility's existing O&M Plan;

"Appendix C" is the template for the schedule of deliverables required under

Paragraph 64.

Dated and entered this 16 day of December, 2022

                         s/Cathy Bissoon
                         Cathy Bissoon
                         United States District Judge

FOR THE UNITED STATES OF AMERICA:

5/5/22
Date

NATHANIEL DOUGLAS
Deputy Section Chief
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice

Devon Ahearn
Jason A. Dunn
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice

62
*Signature Page for United States et al. v. United States Steel Corporation*

FOR THE U.S. ENVIRONMENTAL PROTECTION
AGENCY OFFICE OF ENFORCEMENT AND
COMPLIANCE ASSURANCE:

# LAWRENCE STARFIELD

Digitally signed by
LAWRENCE STARFIELD
Date: 2022.05.11
16:26:33 -04'00'

Lawrence E. Starfield
Acting Assistant Administrator
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue
Washington, D.C.  20460

*Signature Page for United States et al. v. United States Steel Corporation*

FOR THE U.S. ENVIRONMENTAL PROTECTION
AGENCY REGION III:

5/2/22
_____
Date

ADAM ORTIZ   Digitally signed by ADAM ORTIZ
Date: 2022.05.02 11:47:43 -04'00'
_____
Adam Ortiz
Regional Administrator
U.S. Environmental Protection Agency, Region III


4/26/22
_____
Date

DONNA MASTRO   Digitally signed by DONNA
MASTRO
Date: 2022.04.26 15:26:32 -04'00'
_____
Donna Mastro
Acting Regional Counsel
U.S. Environmental Protection Agency, Region III


4/26/22
_____
Date

DANIEL   Digitally signed by DANIEL
BOEHMCKE
BOEHMCKE   Date: 2022.04.26 15:22:44 -04'00'
_____
Daniel Boehmcke
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region III
Office of Regional Counsel

*Signature Page for United States et al. v. United States Steel Corporation*

FOR THE ALLEGHENY COUNTY HEALTH
DEPARTMENT:

4/26/2022
Date

Dean DeLuca
Air Quality Program Manager

4/26/2022
Date

Jason K. Willis
Solicitor

65

*Signature Page for United States et al. v. United States Steel Corporation*

FOR UNITED STATES STEEL CORPORATION:

4/5/2022
Date

Kurt Barshick
General Manager
United States Steel – Mon Valley Works

4/5/2022
Date

David W. Hacker
Senior Counsel

*Signature Page for United States et al. v. United States Steel Corporation*